*1092 Concurrence by Judge CLIFTON (setting forth the majority opinion as to Appellants’ challenge to Jury Instruction 50)
OPINION
IKUTA, Circuit Judge [1]:
Rafael Munoz Gonzalez, Cesar Munoz Gonzalez, Abraham Aldana, and Michael Torres appeal their convictions and sentences for racketeering, drug trafficking conspiracy, and related offenses. We hold that the district court’s jury instruction for determining drug quantities under 21 U.S.C. § 841(b) was not reversible error, even though the jury was not required to find that the drug quantities related to violations that were part of a jointly undertaken criminal activity. Nor did the district court err in denying a defendant’s request for an instruction on multiple conspiracies where the evidence did not show that the defendant was involved only in a separate, unrelated conspiracy. We also hold that the district court did not err in concluding that the defendants had state convictions that were prior to the conviction in this case for purposes of the § 841(b) mandatory minimum. We therefore affirm the defendants’ convictions and sentences.[2]
I
Founded in 1955 in the city of La Puente in Southern California, the Puente-13 street gang is a sophisticated, vertically integrated operation involved in the manufacture, distribution, and sale of narcotics. By 2010, the gang had about 600 documented members who were organized into a number of separate divisions and maintained a large network of stash houses. Though the drug enterprise was carried out on a large scale, Puente-13’s business model was simple: the gang carved out a territorial monopoly on drug distribution, then collected the revenues provided by that monopoly. Drug dealers within Puente-13’s territory were expected to obtain their supply from the gang, and each was required to pay the gang a portion of their revenues. Sellers who obtained narcotics from other sources, were associated with other gangs, or refused to pay “taxes” were attacked or excluded from Puente-13’s territory. Puente-13’s business therefore relied on its ability to maintain monopoly control over its territory, meaning that its efforts .to exclude or tax rival gangs were as important to its success as actual drug sales. Accordingly, Puente-13 used a number of means to enforce its territorial monopoly, including robberies, prison violence, assaults, kidnappings, murder, attempted murder, and drive-by shootings. Puente-13 also worked to protect its operations from law enforcement, engaging in routine counter-surveillance against law enforcement officers.
Puente-13 is subordinate to the Mexican Mafia gang, a prison-based gang that controls the sureño gangs.[3] As a subsidiary, Puente-13 remits a portion of revenues from illegal activities, especially drug proceeds, to the Mexican Mafia. Puente-13 members also act as the Mexican Mafia’s agents, serving as street-level enforcers and collecting taxes from outsiders who sell drugs within Puente-13 territory.
Beginning in the early 2000s, the Los Angeles County Sheriffs Department conducted a multi-year investigation of Puente-13. That investigation identified *1093 defendants Rafael Munoz Gonzalez, Cesar Munoz Gonzalez, Abraham Aldana, and Michael Torres as key figures in the gang. Following the conclusion of the investigation, the government presented its evidence to three separate grand juries, which resulted in a final eight-count criminal indictment.[4]
Before trial, the government filed a sentencing information under 21 U.S.C. § 851[5] alleging that each of the four defendants had prior felony drug convictions subjecting them to mandatory minimum sentences. When the government files an § 851 information, defendants may be subject to an increased statutory minimum sentence under 21 U.S.C. § 841, which sets terms of imprisonment based on the drug quantities and prior convictions of each defendant. 21 U.S.C. § 841(b). ’The first § 851 information alleged that Cesar Munoz Gonzalez had two prior drug convictions: a 1995 conviction for Possession of Cocaine Base for Sale under section 11351.5 of the California Health and Safety Code, and a 2000 conviction for Possession for Sale of Methamphetamine under section 11378 of the California Health and Safety Code. It also alleged that Aldana had one prior drug conviction, a 2002 conviction for Possession for. Sale of Methamphetamine under section 11378 of the California Health and Safety Code. Finally, the first § 851 information alleged that Torres had a 1994 conviction for Possession of Cocaine under section 11350(a) of the California Health and Safety Code. The second § 851 information addressed Rafael Munoz Gonzalez’s prior offenses, alleging that he had a 1989 conviction for Possession with Intent to Distribute Crack Cocaine under 21 U.S.C. § 841(a)(1),[6] and a 2000 conviction for Possession of a Controlled Substance for Sale under section 11378 of the California Health and Safety Code.
Over the course of a 23-day trial, the government presented evidence showing the following. Rafael Munoz Gonzalez was the leader of Puente-13, as well as an important member of the Mexican Mafia. Rafael Munoz Gonzalez set the agenda for Puente-13 even when he was in prison, issuing orders to other gang members and receiving revenues from drug sales. As leader, he pursued an aggressive expan *1094 sion strategy in order to enlarge the gang’s business by expanding its territorial control. To further this strategy, Rafael Munoz Gonzalez ordered members to extort pioney from all drug dealers within the gang’s territory. He also ordered gang members to purchase their methamphetamine exclusively from his brother, Cesar Munoz Gonzalez.
Cesar Munoz Gonzalez was the nominal leader of Puente-13 while Rafael was in prison. Like his brother, Cesar Munoz Gonzalez worked to subdue rivals, urging Puente-13 members to tax all drug dealers within their territory and to enforce taxation through extortion, assault, and murder. Cesar Munoz Gonzalez’s primary responsibility was managing the production and sale of methamphetamine; he • was known within the gang as a high-quantity methamphetamine dealer. In connection with his production responsibilities, Cesar Munoz Gonzalez shared a proprietary method for producing a superior and more marketable form of methamphetamine with a few trusted cohorts. Cesar Munoz Gonzalez used a stash house on Fourth Avenue in La Puente for production and storage of the product, as well as a center for methamphetamine distribution.
Abraham Aldana was a longtime Puente-13 member and one of Rafael Munoz Gonzalez’s top lieutenants. Aldana’s involvement in Puente-13 was twofold. With respect to the drug production and distribution aspects of the business, Alda-na personally . purchased methamphetamine from a Puente-13 dealer and sold methamphetamine within Puente-13’s territory. Between 1998 and 2002, Aldana purchased methamphetamine five times from Andy Villa, then a Puente 13 member, and resold it from his own house. In 2008, Steven Nunez, another Puente-13 member,' sold Aldana methamphetamine five times after Aldana was released from prison. Aldana, in turn, sold methamphetamine “four or five times a week.” In December 2008, a law enforcement search of Aldana’s residence uncovered 3.17 grams of methamphetamine.
With respect to other aspects of the business, Aldana served as Rafael Munoz Gonzalez’s representative and enforcer. Among other acts, Aldana negotiated with the Mexican Mafia for additional resources to assist Rafael Munoz Gonzalez’s efforts to organize attacks against rival gang members both inside and outside of prison. Aldana also personally extorted drug payments from rival gang members, collected taxes from Puente-13 members, and threatened violence if the targets failed to comply. On occasion, Aldana- took cars from drug dealers in lieu of tax payments.
Michael Torres was an associate of Puente-13 and was involved primarily in transporting and delivering drugs and drug proceeds. Torres resided at Cesar Munoz Gonzalez’s Fourth Avenue stash house and helped with sales and tax collection. While living at the stash house, Torres sold at least 30 pounds of methamphetamine and helped manufacture methamphetamine on numerous occasions. Torres also stored a firearm in his room at the stash house in order to protect the gang’s operations.
At the conclusion of trial, the jury convicted the defendants on all counts. The district court then held individual sentencing hearings to consider the government’s § 851 informations. After determining that Rafael Munoz Gonzalez and Cesar Munoz Gonzalez each had two prior drug offenses as alleged in the § 851 informations, the district court sentenced both to the mandatory minimum sentence of life imprisonment, The court determined that Aldana had one prior drug conviction and was subject to the mandatory minimum sentence of 20 years. It sentenced Aldana to 324 months. Finally, the court determined *1095 that Torres was subject to the same 20-year mandatory minimum sentence because of one prior drug conviction and to an additional five-year mandatory minimum sentence because of his conviction under 18 U.S.C. § 924. The court sentenced Torres to 300 months.
II
On appeal, the defendants challenge the jury instructions for Counts Seven and Eight and the district court’s determination that the defendants were subject to mandatory minimum sentences under 21 U.S.C. § 841(b). We have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742.
A
All four defendants challenge Jury Instruction 50, which addressed the drug quantity determinations required by 21 U.S.C. § 841(b). Under § 841, any defendant convicted of a drug offense in violation of § 841(a) “shall be sentenced” to the penalties set forth in § 841(b). 21 U.S.C. § 841(b). Section 841(b)(1)(A) provides that “[i]n the case of a violation of [§ 841(a)] involving ... 50 grams or more of methamphetamine, its salts, isomers, and salts of its isomers or 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, its salts, isomers, or salts of its isomers,” the defendant shall be subject to one of several specified mandatory minimum sentences. 21 U.S;C. § 841(b)(1)(A).[7] The alleged violations at issue were those set forth in Count Seven (which alleged-that all four defendants engaged in a drug trafficking conspiracy in violation of 21 U.S.C. § 846), and those set forth in Count Eight (which charged Rafael Munoz Gonzalez, Cesar Munoz Gonzalez, and Torres with substantive drug trafficking under 21 U.S.C. § 841). Jury Instruction 50 stated:
If you find any defendant guilty of Count Seven or Eight of the indictment (or both), you are then to determine, as to each defendant, which of the certain weights of methamphetamine on the special verdict forms the government proved beyond a reasonable doubt was reasonably foreseeable to each defendant in connection with his criminal activity.
Pursuant to Jury Instruction 50, the jury made a special finding that “it was reasonably foreseeable” to each defendant “that the overall conspiracy involved the distribution of’ (i) 50 grams or more of “pure or actual”' methamphetamine and (ii) ,500 grams or more of a mixture or substance containing a detectable amount of methamphetamine.
On appeal, the defendants argue that Jury Instruction 50 was erroneous because it did not instruct the jury that it had to find that the drug quantities were associat *1096 ed with conduct that was in furtherance of jointly undertaken criminal activity in addition to being reasonably foreseeable to each defendant.
In making this argument, the defendants rely on United States v, Becerra, 992 F.2d 960 (9th Cir. 1993). In Becerra, defendants who had been part of a conspiracy to sell drugs argued that the district court had erred in calculating the quantity of drugs attributable to their conduct and had therefore imposed an erroneous sentence. Id. at 966. Among other things, they argued that “the evidence was insufficient to support a finding that each ‘knew or could reasonably foresee’” that their co-defendant would negotiate a 25-kilogram deal “or that each had agreed to a conspiracy of that scope.” Id. In addressing this argument, Becerra explained that “(under the Guidelines, each conspirator may be sentenced only for the quantity of drugs that he reasonably foresaw would be distributed or that fell within the scope of his own agreement with his co-conspirators.” Id. (emphasis added).[8] Applying this standard, we upheld the sentence of one of the defendants because the evidence at trial was sufficient for the court to find that the defendant had “participated in negotiations for the 25 kilograms or that he knew or reasonably should have foreseen that such an amount would be negotiated.” Id. at 966-67. We reversed the sentence of the other defendant because such evidence was lacking. Id. at 967. In a footnote, Becerra then indicated that the same analysis would apply to the determination of drug quantities under § 841. Id. at 967 n.2. Although noting the language of § 841(b) referenced violations “involving” specified quantities of drugs, Becerra rejected the government’s argument that § 841(b) allowed a court “to sentence a defendant based on the amount of cocaine ‘involved’ in an offense, rather than assessing an individual defendant’s level of responsibility” because there was “no reason why sentencing under the statutory mandatory mínimums should differ” from sentencing under the Guidelines. Id. Without further explanation, we held that the government “must show that a particular defendant had some connection with the larger amount on which the sentencing is based or that he' could reasonably foresee that such an amount would be involved in the transactions of which he was guilty.” Id. (emphasis added).
In United States v. Banuelos, we directly applied the § 1B1.3 standard addressed in Becerra to determinations of drug quantities under § 841(b). 322 F.3d 700, 704 (9th Cir. 2003). Banuelos stated that “in order to sentence [the defendant] pursuant to § 841(b)(1)(A) — or any penalty provision tied to a particular type or quantity of drug — the district court was required to *1097 And not only that the conspiracy distributed a particular type and quantity of drugs, but also that the type and quantity were either within the scope of [the defendant’s] agreement with his coconspirators or that the type and quantity were reasonably foreseeable to [the defendant].” Id. (emphasis added).
In reaching this conclusion, Banuelos applied the disjunctive formulation of § 1B1.3(a)(1)(B) set forth in Becerra, even though the Sentencing Commission had amended the Guidelines in 1992 and adopted a conjunctive approach. Section 1B1.3 of the 1992 version of the Guidelines provided that “in the case of a jointly undertaken criminal activity ... all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity” would be considered “relevant conduct.” U.S.S.G. § 1B1.3(a)(1)(B) (1992). The application notes reiterate this language, stating that “[i]n the case of a jointly undertaken criminal activity [§ l1B1.3(a)(l)(B)] provides that a defendant is accountable for the conduct (acts and omissions) of others that was both: (i) in furtherance of the jointly undertaken criminal activity; and (ii) reasonably foreseeable in connection with that criminal activity.” Id. § 1B1.3 cmt. n.2. This formulation differed from the one considered in Becerra and Banuelos not only because it was conjunctive, but also because it required a finding that the conduct was “in furtherance of’ the jointly undertaken criminal activity rather than require a finding that the conduct at issue was “within the scope” of the defendant’s agreement with his coconspirators.[9]
In United States v. Ortiz, we recognized for the first time that the Guidelines formulation of § 1B1.3 had changed in 1992. 362 F.3d 1274, 1275 (9th Cir. 2004). We explained that under the prior version of the Guidelines, the standard for determining relevant conduct was disjunctive: “that each conspirator is to be held accountable for conduct that he reasonably foresaw or which fell within the scope of his particular agreement.” Id. Under the new Guidelines language, we explained, the test was conjunctive, and we expressly held that “a district court must find that the conduct of others was both jointly undertaken and reasonably foreseeable for § 1B1.3(a)(1)(B) as revised in 1992 to apply.” Id. at 1277.[10] (Ortiz did not consider the distinction be *1098 tween our “within the -scope” requirement and the Guidelines’ new “in furtherance of’ requirement.) We accordingly applied the revised Guidelines standard in considering the defendant’s challenge to his sentence and concluded that the district court had correctly found that .-the defendant was responsible for specific quantities of drugs “because they were in- furtherance of the conspiracy • in which [the defendant] was involved and of which he had knowledge.” Id.
The defendants argue that we are now compelled to apply the conjunctive standard adopted in Ortiz to determine the quantities of drugs under § 841(b). The defendants reason that Becerra stated that there was “no reason why sentencing under the statutory mandatory mínimums should differ” from the Guidelines, 992 F.2d at 967 n.2. By this logic, whenever the Sentencing Commission revises its standard for determining relevant conduct under § 1B1.3, we are bound to change our interpretation of § 841(b) to conform to the Guidelines. According to defendants, Jury Instruction 60 therefore should have required the jury to determine what drug quantity was both “reasonably foreseeable to each defendant” and in furtherance of jointly undertaken activity.
The defendants’ argument fails because neither the Sentencing Commission’s 1992 revisions to § 1B1.3 nor our interpretation of § 1B1.3 in Ortiz constitutes intervening controlling authority that is “clearly irreconcilable” with Banuelos. See Miller v. Gammie, 335 F.3d 889, 900 (9th Cir. 2003) (en banc). Revisions to the Guidelines do not themselves constitute intervening controlling authority, because the Guidelines do not affect our interpretation of a statute such as § 841. “While in some cases the sentencing guidelines may be instructive in interpreting a federal statute, nothing in the guidelines requires us to apply guideline definitions in construing a federal sentencing statute.” United States v. Liquori, 5 F.3d 435, 438 (9th Cir. 1993) (holding that the Guidelines’ definition of -cónsoli-dated offenses was “not applicable” to a statutory minimum sentence imposed under-§ 841). Indeed, Banuelos itself followed Becerra’s interpretation of § 841(b) rather than change that interpretation to conform to § 1B1.3 as revised in 1992. We should follow the same course here. Nor does our statement in Becerra that we “see no reason” why sentencing under-the mandatory mínimums in § 841(b) should differ from sentencing under the then-mandatory Guidelines, 992 F.2d at 967 n.2, constitute a holding that our interpretation of § 841(b) must change when the Sentencing Commission revises its definition of “relevant conduct” under § 1B1.3. Rather, this comment merely explained why we rejected the government’s argument that it need prove only the amount of cocaine “involved” in an offense and not the amount of drugs for which the defendant was individually responsible. Id. Because there, has been no intervening controlling authority overruling our.interpretation of § 841(b) in Banuelos, we are bound by Banuelos’s interpretation of § 841(b) as requiring the trier of fact to find that the type and quantity of drugs “were either within the scope of [the defendant’s] agreement with his coconspirators or that the type and quantity were reasonably foreseeable to [the defendant].'” 322 F.3d at 704.
Although we are bound by our precedent, applying Becerra in this context is far from satisfactory, and we should consider revisiting this issue en banc. Because Banuelos relied on Becerra, and Becerra relied' on the Guidelines, the rationale underlying the interpretation of § 841(b) in Becerra and' Banuelos has been undermined. Moreover, Becerra’s reasoning is not persuasive. Among other things, we have not yet explained how our standard is consistent with-the-plain-text of § 841(b), *1099 which requires a court to first identify the violation of § 841(a) at issue and then determine whether that violation was-“involving” specified quantities of drugs. To the extent we interpret § 841(b) as requiring an analysis of when a defendant can be held liable for the conduct of co-defendants, we have not provided a reasoned explanation of why our general principles for determining co-conspirator liability do not apply to drug quantity determinations. Generally, liability for the acts of co-conspirators is determined by the Pinkerton doctrine, which “makes a conspirator criminally liable for the substantive offenses committed by a co-conspirator when they are reasonably foreseeable and committed in furtherance of the conspiracy.” United States v. Long, 301 F.3d 1095, 1103 (9th Cir. 2002) (per curiam). A different standard applies in “establishing vicarious liability for acts establishing the crime of conspiracy itself,” where “a- conspirator who joins a preexisting conspiracy is bound by all that has gone on before in the conspiracy.” United States v. Garcia, 497 F.3d 964, 968 n.1 (9th Cir. 2007). It is unclear why these standards should be set aside in favor of an advisory Sentencing Guideline defining “relevant conduct,” a Guidelines term not found in § 841(b). Nevertheless, despite these reasons to revisit Banuelos, we do “not have the authority to ignore circuit court precedent.” Mohamed v. Uber Techs., Inc., 848 F.3d 1201, 1211 (9th Cir. 2016). We are bound by Banuelos “unless and until” it is “overruled by a body competent to do so.” Hart v. Massanari, 266 F.3d 1155, 1170 (9th Cir. 2001).
The majority acknowledges that we “should be careful to respect our precedent” but then declines to follow precedent here because “[t]his is not the ordinary situation.” Majority at 1105-06. According to the majority, we should not follow our precedent here because it is not equivalent to the Guidelines approach, and we held “on at least three separate occasions, that the same approach should be applied when analyzing culpability under § 841(b) as is applied under the .Guidelines.” Majority at 1106. This statement is misleading, however, because the cases on which the majority relies, Banuelos, and United States v. Mesa-Farias, 53 F.3d 258 (9th Cir. 1995), merely followed Becerra's interpretation of § 841(b). As noted earlier, supra at 1098, Banuelos faithfully followed precedent instead of applying .the Guidelines approach: the then-effective Guidelines required application of the conjunctive approach to analyzing culpability, see supra at 1096-97, but Banuelos applied Becerra’s disjunctive approach instead. Banuelos, 322 F,3d at 705. And in Mesa-Farias, we noted Becerra’s disjunctive test that “the quantity of drugs--be reasonably foreseeable,” but held that the test was limited to convictions for conspiracy and did not apply to convictions for possession. 53 F.3d at 260.
Rather than follow our precedent, the majority attempts to sidestep the issue by conducting a plain error analysis, concluding that “even if the jury instructions were erroneous, any error by the district court did not affect the defendants’ substantial rights.” Majority at 1107 (emphasis, added). But this plain error analysis itself is flawed. First, there is. no colorable basis for holding that the district court erred. We have never applied the conjunctive standard to § 841(b). Nor have we ever required a finding that the conduct at issue was “in furtherance of’ jointly undertaken criminal activity, rather than “within the scope” of the conspiracy. Instead, we have held that .the trier of fact must find that the type and quantity of drugs were “either within the scope of [the defendant’s] agreement with his coconspirators or that the type and quantity were reasonably foreseeable to [the defendant].” Banuelos, 322 F.3d at 704 (emphasis added). Like us, *1100 “[t]he district court does not have the authority to ignore circuit court precedent” and would have had no basis for applying the conjunctive standard to § 841(b). Mohamed, 848 F.3d at 1211.
Second, the majority’s plain error analysis merely adopts the Becerra test under a different name. The majority reasons that had the jury been instructed to find that the quantity of drugs was “in furtherance of a jointly undertaken criminal activity” as well as being reasonably foreseeable, the jury almost certainly would have found the “in furtherance of’ element because there was substantial evidence that each defendant was involved in the Puente-13 drug conspiracy. Majority at 1107. As a practical matter, this reasoning means that whenever a defendant has been convicted of a conspiracy to distribute drugs, and the jury finds the quantity of drugs is reasonably foreseeable, it would never be plain error to omit the “in furtherance of’ instruction. In effect, the majority’s plain error analysis makes the “in furtherance” requirement superfluous.
Finally, the majority’s approach is flawed for an institutional reason. Because it applies a plain error analysis, the majority concludes that it is “not prompted to call for our court to revisit the broader issue en banc in the context of this case because in the end it would not alter its outcome.” Majority at 1107. But it is our responsibility as a circuit court to clarify confusing or contradictory precedent, particularly where the majority’s “plain error” resolution effectively deprives the defendants of the benefit of the “in furtherance” language to which they would be entitled under the conjunctive approach. That is what we did in Ortiz where we sought to “eliminate confusion” by clarifying the standard for applying the revised § 1B1.3, even though the standard did not alter the outcome in that case. Ortiz, 362 F.3d at 1275, 1277. Or, if the majority believes that this case is controlled by contradictory precedents which will ultimately need en banc review to sort out, Majority at 1106, then under our precedent we “must call for en banc review” sua sponte, United States v. Hardesty, 977 F.2d 1347, 1348 (9th Cir. 1992) (en banc) (per curiam) (quoting Atonio v. Wards Cove Packing Co., 810 F.2d 1477, 1479 (9th Cir. 1987) (en banc)). In short, rather than effectively kick the can down the road, we should either clarify the law or make a sua sponte call for rehearing en banc.
Because we remain bound by Banuelos, the district court did not err in only requiring the jury to determine what quantities of drugs were reasonably foreseeable to each defendant in connection with his criminal activity. This instruction satisfied Banuelos’s requirement that the trier of fact find “the quantity of drugs that either (1) fell within the scope of the defendant’s agreement with his coconspirators or (2) was reasonably foreseeable to the defendant.” 322 F.3d at 704.
B
Defendant Aldana challenges the jury instructions for Count Seven (conspiracy to distribute methamphetamine in violation of § 846) on a separate ground: that the district court erred because the jury instructions did not allow him to present his theory that he was involved in a separate conspiracy unconnected to the actions of the other defendants. At trial, several defendants (including Aldana) asked the district court to include Ninth Circuit Model Criminal Jury Instruction 8.22 on “multiple conspiracies,” which states:
You must decide whether the conspiracy charged in the indictment existed, and, if it did, who at least some of its members were. If you find that the conspiracy charged did not exist, then you must return a not guilty verdict, even though *1101 you may find that some other conspiracy existed. Similarly, if you find that any defendant was not a member of the charged conspiracy, then you must find that defendant not guilty, even though that defendant may have been a member of some other conspiracy.
The district court denied the defendants’ request for this instruction at trial. It explained that such an instruction may be required “if the defendants were involved only in a minor conspiracy unrelated to the overall conspiracy.” In this case, however, the court indicated that rather than showing individual drug conspiracies, “the evidence has been plentiful and consistent that Puente 13 was an enterprise with certain specified objectives” including drug dealing, gang welfare or maintenance, and gang structure.
Aldana argues that the district court erred in declining to give a multiple conspiracies instruction because based on the evidence at trial, a jury could have rationally concluded that his drug distribution activities were not part of the Puente-13 conspiracy described in Count 7, but rather comprised separate conspiracies involving different co-conspirators. According to Aldana, the government presented evidence that Aldana personally took part in only two sets of transactions directly involving methamphetamine possession and distribution: the 1998-2002 purchases and sales (based on Villa’s testimony) and the 2008 purchases and sales (based on Nunez’s testimony). See supra at 1093-94. Aldana claims that the government failed to connect either of these sets of transactions with the activities of the other named defendants, and therefore failed to show that Aldana had anything other than individual agreements with Villa and Nunez. Accordingly, Aldana claims, the district court erred in denying his request for the § 8.22 multiple conspiracies instruction.
We disagree. “A defendant is entitled to an instruction on his theory of the case if the theory is legally cognizable and there is evidence upon which the jury could rationally find for the defendant.” United States v. Morton, 999 F.2d 435, 437 (9th Cir. 1993). A trial court need not provide an instruction if “the evidence, as described in the defendant’s offer of proof, is insufficient as a matter of law to support the proffered defense.” United States v, Dorrell, 758 F.2d 427, 430 (9th Cir. 1985). A defendant is entitled to a multiple conspiracies instruction “where the indictment charges several defendants with one overall conspiracy, but the proof at trial indicates that a jury could reasonably conclude that some of the defendants were only involved in separate conspiracies unrelated to the overall conspiracy charged in the indictment,” United States v. Anguiano, 873 F.2d 1314, 1317 (9th Cir. 1989) (emphasis added). Accordingly, Aldana would have been entitled to a multiple conspiracies instruction if there were evidence from which the jury could rationally conclude that Aldana was not involved in the conspiracy described in Count 7, but was only involved in separate conspiracies unrelated to the Count 7 conspiracy.
Here, there was no evidence presented at trial from which the jury could have rationally concluded that Aldana was only involved in a separate conspiracy. Both Nunez and Villa were, like Aldana and the other defendants, members of Puente-13 and obtained methamphetamine from Puente-13 suppliers. Further, Aldana’s relationship with Nunez in particular extended well beyond the drug deals described at trial. Nunez testified that he regularly worked with Aldana on behalf of Rafael Munoz Gonzalez and that Aldana took over Nunez’s position as chief lieutenant when Aldana got out of prison. According to Nunez’s testimony, Nunez and Aldana worked together to locate drug dealers *1102 who had failed to pay taxes and were in hiding. They had six or seven confrontations with such dealers, and took their cars in lieu of cash payments; Nunez spoke to Aldana in prison multiple times regarding Puente-13 business, and Aldana used Nunez as a conduit to communicate with Rar fael Munoz Gonzalez.
Even if Nunez and Villa were not involved in all aspects of the conspiracy alleged in the indictment, Aldana’s interactions with them furthered the Puente-13 conspiracy because they contributed to the gang’s efforts to distribute drugs and to control drug-related activities within its territory. “A single conspiracy may involve several subagreements or subgroups of conspirators.” United States v. Bibbero, 749 F.2d 581, 587 (9th Cir. 1984); see also United States v. Perry, 550 F.2d 524, 533 (9th Cir. 1977) (“To suggest that defendants should be acquitted of the general conspiracy charge just because some of them met singly with other defendants and conspired with them to carry out the overall common distribution plan is a misapplication of the law of conspiracy.”). Further, Aldana did not adduce any testimony or other evidence at trial that undercut the government’s evidence regarding Aldana’s activities in furtherance of Puente-13’s objectives.[11] Absent such testimony, there is no. “evidence upon which the jury could rationally sustain the defense” that Aldana was a member only of separate conspiracies and not of the Puente-13 conspiracy. United States v. Jackson, 726 F.2d 1466, 1468 (9th Cir. 1984) (per curiam). Accordingly, the district court did not err by denying Aldana’s request for a multiple conspiracies instruction.
in
All four defendants challenge the district court’s imposition of mandatory minimum sentences under 21 U.S.C. § 841. Section 841(a) makes it unlawful for any person “to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance.” 21 U.S.C. § 841(a)(1). Where a violation of § 841(a) involved 50 or more grams of methamphetamine or 500 or more grams of a substance “containing a detectable amount of methamphetamine,” a defendant with a prior conviction for a felony, drug offense “shall be sentenced to a term of imprisonment which may not be less than 20 years,” while a defendant with two or more prior convictions for a felony drug offense “shall be sentenced to. a, mandatory term of life imprisonment without release.” Id. § 841(b)(1)(A)(viii).
In this case, all four defendants were convicted under 21 U.S.C. § 846 of conspiracy to violate § 841(a)(1). Section 846 provides that “[a]ny person who ... conspires to commit any offense defined in [§ 841] shall be subject to the same penalties” as a person who violates § 841(a). Each of the defendants was therefore, subjected to an enhanced sentence under § 841(b)(1)(A)(viii) because of the drag quantity and their prior conviction or convictions. The defendants raise two challenges to the use of their prior state convictions to subject them to mandatory minimum sentences.
A
First, the four defendants jointly argue that their prior state convictions did no.t trigger sentencing enhancements under § 841(b) because they were not committed *1103 “prior” to the offense for which they were convicted in this case. The defendants point out that some of the conduct alleged in Count Seven occurred prior to 2003 and argue that this pre-2003 conduct also underlays the state convictions that were used to enhance their sentences under § 841(b). Because the defendants’ state convictions overlap temporally with their convictions in this case, the defendants argue that the state convictions cannot be considered “prior” to the offense of conviction in this case.
We disagree. In United States v. Baker, the appellant similarly argued that his California state narcotics convictions could not be used to enhance his federal sentence under § 841(b) because “(1) [his] state convictions were related to the charges in the federal trial, and (2) his entire involvement in the [federal] methamphetamine conspiracy predated the finality of his state convictions.” 10 F.3d 1374, 1420 (9th Cir. 1993), overruled on other grounds by United States v. Nordby, 225 F.3d 1053 (9th Cir. 2000). We rejected the appellant’s arguments, holding that the fact “the federal and state charges derive in part from the same activity does not preclude using the state convictions to enhance the federal sentence” where “the dates, events, and locations involved in the federal trial covered a much broader range of criminal conduct than the state convictions.” Id. So long as the jury concludes “that [the defendant] participated in the conspiracy during the entire time period alleged in the indictment” and that period “extended beyond the date of the state convictions,”- the related state conviction may properly be used to enhance the defendant’s sentence. Id. at 1421.[12]
Here, the jury verdict necessarily determined that the defendants’ conspiracy continued past the dates when their state convictions became final. As established in the § 851 proceeding,. all of the defendants’ prior convictions occurred before 2003. In contrast, the indictment alleged that the conspiracy continued until “on or about June 2, 2010.” Because the jury was required to find that the criminal agreement existed “on the dates set forth in the indictment” in order to convict on Count Seven, the jury’s guilty verdict, necessarily established that the conspiracy existed until June 2010, well past the dates that the defendants’ prior convictions became final. The district court therefore did not err in relying on the defendants’ prior drug convictions to impose mandatory minimum penalties under § 841(b). Baker, 10 F.3d at 1420-21.[13]
B
The defendants next argue that §§ 841(b) and 851 violate the Sixth Amendment as interpreted in Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and Alleyne v. United States, 570 U.S. 99, 133 S.Ct. 2151, *1104 186 L.Ed.2d 314 (2013). In those cases, the Supreme Court held that “[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum,” Apprendi, 530 U.S. at 490, 120 S.Ct. 2348, or “increases the mandatory minimum,” Alleyne, 133 S.Ct. at 2155, must be submitted to a jury and proved beyond a reasonable doubt. The district court, however, may find “the fact of a prior conviction.” Apprendi, 530 U.S. at 490, 120 S.Ct. 2348; Alleyne, 133 S.Ct. at 2168; see also Almendarez-Torres v. United States, 523 U.S. 224, 226-27, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998). The defendants argue that while a court may find the existence of a “conviction,” the determination that the conviction is “prior” in time must be made by the jury. Therefore, defendants argue, because § 851 permits a judge to determine whether the defendant’s “prior conviction for a felony drug offense” occurred before the instant offense, it is invalid. We reject the defendants’ argument. By permitting a court to find “the fact of a prior conviction,” Apprendi, 530 U.S. at 490, 120 S.Ct. 2348 (emphasis added), the Supreme Court empowered a court to determine that the conviction was prior to the case before the court. United States v. Covian-Sandoval is not to the contrary; that case merely held that the district court could not find the fact of a final judgment in a case, such as an. immigration proceeding, that did not give the defendant a right to jury trial or proof beyond a reasonable doubt. 462 F.3d 1090, 1097 (9th Cir. 2006).
AFFIRMED.

. Judge Ikuta's opinion is the opinion of the majority of the court except as to section II.A. That section constitutes Judge Ikuta’s special concurrence.

. We reject the defendants' remaining arguments in a memorandum disposition filed concurrently with this opinion. See United States v. Torres, _ Fed.Appx. _ (9th Cir. 2017).

.According to testimony at trial, a "sureño” is a person who is a soldier for the Mexican Mafia.

. Counts One, Two, and Seven charged all four defendants. Count One charged racketeering conspiracy under 18 U.S.C. § 1962(d); Count Two charged substantive racketeering under 18 U.S.C. § 1962(c) based on membership in Puente-13; and Count Seven charged conspiracy to distribute methamphetamine in violation of 21 U.S.C. § 846. The government alleged that the defendants committed 86 overt acts in support of their drug conspiracy. Counts three and four were omitted. Count Five charged Rafael Munoz Gonzalez and Aldana with a Violent Crime in Aid of Racketeering (VICAR), conspiracy to commit assault under 18 U.S.C. § 1959(a)(6). Count Six charged Rafael Munoz Gonzalez with a second VICAR crime, conspiracy to commit murder under 18 U.S.C. § 1959(a)(5). Counts Eight and Nine charged Rafael Munoz Gonzalez, Cesar Munoz Gonzalez, and Torres with possession with intent to distribute methamphetamine under 21 U.S.C. § 841, and pos session of a firearm in furtherance of a drug trafficking offense under 18 U.S.C. § 924(c), respectively. Count Ten charged Torres with possession of a firearm by a convicted felon under 18 U.S.C. § 922(g).

. Section 851 provides that in order for a defendant to receive increased punishment based on the defendant's prior convictions, the government must first identify those prior convictions by filing an information with the court and serving a copy on the defendant before trial. 21 U.S.C. § 851(a)(1).

. At sentencing, the government instead relied on a 1990 conviction for conspiracy to distribute cocaine under 21 U.S.C. § 846. This error does not affect our analysis, however, because it was corrected prior to sentencing and Rafael Munoz Gonzalez was sentenced on the basis of a § 846 predicate offense.

. 21 U.S.C, § 841(b) states, in pertinent part: (b) Penalties
Except as otherwise provided in [sections not relevant here], any person who violates subsection (a) of this section [enumerating unlawful drug offenses] shall be sentenced as follows: (1)(A) In the case of a violation of subsection (a) of this section involving— .,. (viii) 50 grams or more of methamphetamine, its salts, isomers, and salts of its isomers or 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, its salts, isomers, or salts of its isomers; '
such person shall be sentenced to a term of imprisonment.If any person commits such a violation after a prior conviction for a felony drug offense has become final, such person shall be sentenced to a term of imprisonment which may not be less than 20 years and not more than life imprisonment .... If any person commits a violation of this subparagraph ... after two or more prior convictions for a felony drug offense have become final, such person shall be sentenced to a mandatory term of life imprisonment without release ....

. It appears that Becerra-relied on the 1991 version of the Guidelines, which was in effect before the Guidelines were amended in November 1992. 992 F.2d at 963. The application notes to § IB 1.3 in the 1991 version provided that “[i]n the case of criminal activity undertaken in concert with others,” a defendant can be held accountable for "conduct of others” that is "in furtherance of the execution of the jointly-undertaken criminal activity” and "was reasonably foreseeable by the defendant.” U.S.S.G. § 1B1.3, cmt. n.1 (1991). The application notes further stated that "the scope of the jointly-undertaken criminal activity, and hence relevant conduct, is not necessarily the same for every participant,” and therefore "[w]here it is established that the conduct was neither within the scope of the defendant’s agreement, nor was reasonably foreseeable in connection with the criminal activity the defendant agreed to jointly undertake, such conduct is not included in establishing the defendant’s offense level under this guideline.” Id. It is unclear why the Sentencing Commission imposed an "in furtherance” requirement in the affirmative formulation of the standard but then used a “within the scope” requirement in the negative formulation,

. The Sentencing Commission again revised § 1B1.3 in 2015, adding a “within the scope” requirement. The conduct in question must now be reasonably foreseeable, in furtherance of the conspiracy, and "within the scope of the jointly undertaken criminal activity.” U.S.S.G. § IB 1.3(a)(1)(B) (2015).

. Despite our conclusion in Ortiz, we subsequently held that it was not plain error to use a disjunctive instruction for jointly undertaken activities under § 1B1.3 of the Guidelines. See United States v. Reed, 575 F.3d 900 (9th Cir. 2009). In Reed, we considered the defendant’s claim that there was “error in establishing his base offense level under the Guidelines,” because “the special verdict form relating to the charged drug quantity” required under the Guidelines asked the jury to determine whether the drug quantity was “either within the scope of the defendant’s agreement with his co-conspirators or ... was reasonably foreseeable” to the defendant. Id. at 927. Under the amended Guidelines, the relevant conduct for sentencing had to be both “(i) in furtherance of the jointly undertaken criminal activity; and (ii) reasonably foreseeable.” Id. (emphasis added). Without mentioning Ortiz, we concluded that the disjunctive formulation was not plain error for two reasons: First, the formulation was consistent with our prior opinion in Banuelos. Id. Second, the defendant could not show prejudice because he was already subject to a mandatory minimum life sentence under § 841(b)(1)(A) regardless of the applicable Guidelines range, and because the defendant had "personally received” the requisite drug quantity. Id. at 928. Because Reed did not address the standard applicable to determining drug quantities under § 841(b), it does not affect the analysis here.

. On appeal, Aldana does not argue that the Puente-13 conspiracy did not exist or that-he was not a member of it, and so does not explain how he is entitled to the multiple conspiracies instruction that he seeks, which allows a jury to find a defendant not guilty if the charged conspiracy did not exist or the defendant was not a member.

. We reject the defendants’ argument that Baker was overruled by Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). Though Apprendi did overrule portions of Baker permitting the district court to find drug quantities for sentencing purposes, it did not address the use of prior state convictions to enhance federal sentences. See Nordby, 225 F.3d at 1059, overruled on other grounds by United States v. Buckland, 289 F.3d 558 (9th Cir. 2002) (en banc).

. Two of our sister circuits have reached the same conclusion. See United States v. Smith, 451 F.3d 209, 224-25 (4th Cir. 2006) (holding that "prior felony drug convictions that fall within the conspiracy period may be used to enhance the defendant’s sentence if the conspiracy continued after his earlier convictions were final”); see also United States v. Fink, 499 F.3d 81, 87-88 (1st Cir. 2007) (same).